## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **vs.** | **:** | **3:24-CR-00015** |
| | **:** | |
| **JORDAN PEREZ,** | **:** | **Honorable Robert S. Ballou** |
| | **:** | |
| **Defendant.** | **:** | |
| | **:** | |

### SENTENCING MEMORANDUM OF JORDAN PEREZ

On January 9, 2026, Jordan Perez will appear before this Court for sentencing. Mr. Perez has pleaded guilty to one count of Conspiracy to Kidnap and one count of Transporting an Alien Resulting in Death. Document ("Doc.") 82 at 1. As an eighteen-year-old boy, Mr. Perez inarguably made a terrible, life-altering decision when he agreed to take payment to drive an undocumented alien from Texas to Virginia. But that decision already has resulted in punishment far beyond what this Court can impose. Mr. Perez's friend, O.H., was shot and killed by the alien's husband. At the same time, Mr. Perez was shot multiple times in the head and chest. "But for truly miraculous medical care, this was a fatal injury."[1] Although Mr. Perez survived, he will never be the same.

For multiple reasons, this is an extraordinary case. *First*, it is an extraordinary case in that the death at issue was that of the Mr. Perez's counterpart, not the alien who was being transported or an innocent bystander. Mr.

---

[1] Report of Dr. James Merikangas (attached as **Exhibit 1**) at 1.

Perez was shot at the same time as O.H., by the same person, and easily could have been killed himself. In other words, the basis of this unusual 8 U.S.C. § 1324(a)(1)(A)(ii) prosecution is a shooting in which Mr. Perez *never fired a weapon* but was himself nearly shot to death. Mr. Perez easily could have been the deceased victim, not the defendant, in this case.

*Second*, this is an extraordinary case in that the offense left Mr. Perez "permanently disabled and unable to live independently."[2] Mr. Perez has neither the physical nor the mental capacity to serve a prison term—an unusual situation that should weigh heavily in this Court's decision. Because of his severe injuries, "Mr. Perez is not a danger to others but *is* at risk himself."[3] Under these extraordinary circumstances, this Court should sentence Mr. Perez to time served, which is approximately sixteen months. This would allow Mr. Perez to live with a stable family member and access necessary medical and mental health services, having been punished and deterred to the greatest extent imaginable.

## THE PLEA AGREEMENT

After Mr. Perez and O.H. were shot in January 2023, the shooter (J.S.) was arrested and charged in the Virginia state court system. Those charges were subsequently dropped. On August 28, 2024, Mr. Perez was charged with conspiracy to kidnap, kidnapping, conspiracy to transport aliens resulting in death, transporting an alien resulting in death, and conspiracy to receive ransom money. Doc. 5. Mr. Perez was arrested and placed in custody in his home state of Texas.

---

[2] *Id.* at 3.
[3] *Id.* at 4.

Upon his arrival in Virginia, he quickly took responsibility in this case. The negotiation and entry of his plea was delayed by the administration's decision to review all prior non-authorization decisions, including Mr. Perez's. On July 17, 2025, Mr. Perez pleaded guilty to conspiracy to kidnap and transporting an alien resulting in death. Doc. 82.

## THE GUIDELINES

The Presentence Investigation Report ("PSR") incorrectly calculates Mr. Perez's guidelines as 235 to 293 months. PSR at ¶ 93. As discussed in Mr. Perez's outstanding objection to the PSR, his guidelines range should be calculated as 210 to 262 months. *See* Doc. 93 at 4.

## STATUTORY SENTENCING FACTORS

In sentencing Mr. Perez, this Court "shall consider . . . the nature and circumstances of the offense and the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1). Mr. Perez's sentence should be "sufficient, but not greater than necessary" to serve the purposes set forth in 18 U.S.C. § 3553(a)(2). Those purposes include deterrence, protection of the public, and "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *Id*. They also include providing Mr. Perez "with needed . . . medical care, or other correctional treatment in the most effective manner[.]" *Id*.

The sentencing guidelines are advisory, not mandatory. *United States v. Booker*, 543 U.S. 220 (2005). "There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'" *Concepcion v. United States*, 597

U.S. 481, 486 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

"[F]ederal courts today generally 'exercise a wide discretion in the sources and types

of evidence used' to craft appropriate sentences.'" *Id.* (quoting *Williams v. New York*,

337 U.S. 241, 246 (1949)). Perhaps most importantly for Mr. Perez's case, "[w]hen a

defendant appears for sentencing, the sentencing court considers the defendant on

*that day*, not on the date of his offense or the date of his conviction." *Id.* (emphasis

added).

    This Court has wide discretion to vary from Mr. Perez's guidelines. "[T]he

sentencing court may not presume that the Guidelines range is reasonable." *United

States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007) (citing *Gall v. United States*, 552

U.S. 38, 47 (2007)). Instead, when varying, this Court must only "consider the

extent of the deviation and ensure that the justification is sufficiently compelling to

support the degree of the variance." *Id.* at 50. The 2025 Guidelines Manual is meant

to simplify this process. The Guidelines explain that "courts are permitted to impose

sentences outside the applicable guidelines range as 'variances,' both for reasons

related to the operation of the applicable guideline provisions and in light of

individual characteristics unrelated to guideline provisions." 2025 Guidelines

Manual at 1.

    The 2025 Guidelines Manual removes departures but contemplates that

courts will continue to consider the traditional bases of departures as variances.

Specifically, the 2025 Guidelines Manual provides for the removal of departures "to

be outcome neutral, intending that judges who would have relied upon facts

previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance . . . ." *Id.* Because this amendment does *not* "reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence," the most recent departure provisions are included as an Appendix to the current manual for this Court's consideration. *Id.* at 1–2.

In other words, historic grounds for departure are now grounds for variance. And departures are historically intended to apply to cases just like this one, where the offense conduct differs from the normal case:

> The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

2024 Guidelines Manual at 7. Notwithstanding a few exceptions, "the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case." *Id.* Consequently, all such factors are now grounds for variances.

This Memorandum contains a detailed discussion of the nature and circumstances of the offense, Mr. Perez's history and characteristics, and other § 3553(a) factors. When considering this information, Mr. Perez asks this Court to bear in mind the following grounds for variance, some of which were former grounds for a departure, and all of which are applicable to this case.

5

*First*, this Court should consider varying due to the unusual nature of the death in this case, which does not fall within the "heartland" of cases typically prosecuted as alien trafficking resulting in death. As noted above, departures were historically intended for the "atypical case" in which "conduct significantly differs from the norm" for that guideline. *See* 2024 Guidelines Manual at 7. Consequently, Guideline §5K2.0 allows the Court to consider circumstances in a case that are not adequately accounted for in the guidelines. 2025 Guidelines Manual, Appendix B at 195–97. The Background to this Guideline clarifies that it is intended to "permit courts to impose an appropriate sentence in the exceptional case in which mechanical application of the guidelines would fail to achieve the statutory purposes and goals of sentencing." *Id.* at 200.

As detailed below, this case falls outside the "heartland" of alien transportation resulting in death. The decedent was not an alien being transported, but rather Mr. Perez's fellow driver. The shooter was not Mr. Perez, but rather the alien's husband. Mr. Perez himself was shot multiple times and almost killed. Perhaps most notably, Mr. Perez was armed and had an opportunity to fire but chose not to. If Mr. Perez *had* fired, he might not have been injured, and his counterpart might not have been killed. But Mr. Perez chose not to fire, risking his own life to avoid taking someone else's. Although Mr. Perez's conduct was criminal, and he has taken responsibility, it was far less culpable than other conduct that would result in the same guidelines. These highly unusual circumstances are more mitigated than the usual case (i.e., a case in which the defendant killed an alien he

6

was trafficking). This Court should thus vary because Mr. Perez's conduct falls outside the heartland of the offense.

*Second*, and relatedly, the Guidelines allow this Court to vary "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior . . . ." §5K2.10, 2025 Guidelines Manual, Appendix B at 203. This provision contemplates that the Court will consider the victim's role in provoking or presenting danger. In this case, the decedent, who was armed, was shot by the alien's husband, J.S. J.S. was originally charged in state court, but those charges were dropped upon a determination that he had acted in self-defense. The decision not to prosecute J.S. was thus tantamount to a determination that the *decedent* constituted a danger, and that J.S. reasonably perceived a danger from him. In other words, prosecuting authorities already have determined that the decedent's wrongful conduct contributed significantly to his death. *See id.* (allowing this Court to consider the "danger actually presented to the defendant by the victim," as well as "relevant conduct by the victim that substantially contributed to the danger presented.") [4]

*Third*, under §5H1.1, this Court should consider varying based on Mr. Perez's age (18) at the time of the offense. This variance is especially warranted due to the adverse childhood experiences that contributed to Mr. Perez's poor decision-making

---

[4] Mr. Perez in no way suggests that the alien victim's conduct contributed to this offense; only that the decedent's conduct contributed to the death at issue. Because it is his death that has resulted in Mr. Perez's high guidelines, his role in the offense behavior is significant.

around the time of this offense. The Guidelines contemplate that the Court will
consider this factor:

> A downward departure also may be warranted due to the defendant's
> youthfulness at the time of the offense or prior offenses. Certain risk
> factors may affect a youthful individual's development into the mid-20's
> and contribute to involvement in criminal justice systems, including
> environment, adverse childhood experiences, substance use, lack of
> educational opportunities, and familial relationships. In addition,
> youthful individuals generally are more impulsive, risk-seeking, and
> susceptible to outside influence as their brains continue to develop into
> young adulthood. Youthful individuals also are more amenable to
> rehabilitation.

§5H1.1, 2025 Guidelines Manual, Appendix B at 191. The Guidelines Manual
further explains that "[t]he age-crime curve, one of the most consistent findings in
criminology, demonstrates that criminal behavior tends to decrease with age." *Id.*
"Accordingly, in an appropriate case, the court may consider whether a form of
punishment other than imprisonment might be sufficient to meet the purposes of
sentencing." *Id.* As is detailed *infra*, Mr. Perez experienced many of the risk factors
that the Guidelines recognize contribute to youthful offending, and thus should be
considered in conjunction with age.

    *Fourth*, this Court should consider varying based on Mr. Perez's physical
condition, which is also detailed *infra*. "Physical condition or appearance, including
physique, may be relevant in determining whether a departure is warranted, if the
condition or appearance, individually or in combination with other offender
characteristics, is present to an unusual degree and distinguishes the case from the
typical cases covered by the guidelines." §5H1.4, 2025 Guidelines Manual, Appendix
B at 192. The Guidelines expressly provide that "extraordinary physical impairment

may be a reason to depart downward; e.g., in the case of a seriously infirm

defendant, home detention may be as efficient as, and less costly than,

imprisonment." *Id.*; *see United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002)

(affirming departure based on factors, including physical condition, that resulted in

"unusual susceptibility to abuse by other inmates while in prison"). Mr. Perez's

extraordinary impairments distinguish his case from others, and he is a prime

candidate for a variance on this basis.

*Fifth*, this Court should combine the above factors as grounds for a variance.

§5K2.0(c). 2025 Guidelines Manual, Appendix B at 196. Such a variance is

warranted where the "offender characteristics or other circumstances, taken

together, make the case an exceptional one," the circumstances and characteristics

are "present to a substantial degree," and each of the circumstances and

characteristics has been separately "identified in the guidelines as a permissible

ground for departure." *Id.* at 196–97. In this case, both the circumstances of the

offense and Mr. Perez's personal circumstances combine for an exceptional case, and

this Court should consider the collective weight of these factors in fashioning a

time-served sentence.

*Finally*, both the nature of the offense and the characteristics of the

defendant more broadly can support a variance, even without reference to historic

departure provisions. *See, e.g.*, *Pauley*, 511 F.3d at 474–75 (upholding variance

based on individual characteristics and fact that defendant was less culpable than

others who committed same offense); *United States v. Whitehead*, 532 F.3d 991, 993

(9th Cir. 2008) (per curiam) (upholding variance based on individual characteristics and role in the offense); *United States v. McFarlin*, 535 F.3d 808, 810–12 (8th Cir. 2008) (variance to a sentence of probation was warranted in part based on the defendant's "poor health" and "need for medical care"); *United States v. Myers*, 503 F.3d 676, 687 (8th Cir. 2007) ("The district court did not abuse its discretion in finding that a shorter period of incarceration, with mental health treatment and supervised release, is the most effective sentence.").

In sum, the case before this Court is a very unusual one. For Mr. Perez, the circumstances of the offense and his own characteristics are now inextricably intertwined, as the offense has left him permanently disabled and unable to live independently. This Memorandum addresses (1) the nature and circumstances of the offense; (2) Mr. Perez's life-threatening and life-changing injuries, which are related to both the offense and his personal characteristics; (3) other aspects of Mr. Perez's history and background; and (4) additional § 3553(a) factors. Each of these issues provides strong grounds for this Court to impose a time-served sentence of sixteen months.

## I.    <u>The Nature and Circumstances of the Offense</u>

When Jordan Perez was a teenager, he met a man named Ricardo Ordaz. Although Ricardo was young, Jordan was significantly younger. Jordan was both impressionable and impressed by Ordaz, who not only had money, but also lived on a large piece of land with an intact family. (As is discussed in more detail in Section 3, these were all things that Jordan lacked as a child and adolescent.) Among the family members living at Ordaz's Texas property was a sister, B.O., who was about

Jordan's age. She and Jordan soon began to date, and Jordan spent much of his time at the Ordaz property, often staying at a camper near their home. Jordan started to observe Ricardo's alien smuggling activities and over time, Ordaz drew the younger, struggling teenager into menial tasks.

On January 7, 2023, Ordaz hired Jordan and his friend, O.H., to transport an undocumented alien named W.G. from Texas to the Maryland-Virginia area. As the Government's Sentencing Memorandum accurately explains, Mr. Perez was not involved in smuggling W.G. across the border, bringing her to Ordaz's house, or making ransom demands. *See* Doc. 99 at 2–3. Jordan was, however, vulnerable to Ordaz's offer of an "easy" way to make money. Ordaz directed Jordan and Osvaldo to meet with W.G.'s husband, J.S., and collect a $10,000 fee in exchange for her. This money was to be returned to Ordaz, who would then pay Jordan and Osvaldo smaller fees for driving.

Jordan, who does not speak Spanish, was not involved in planning the exchange. *See* Exhibit B to Government's Sentencing Memorandum (messages between Ordaz and J.S.). The plan, made and communicated between Ordaz and J.S., was for J.S. to attend the exchange accompanied only by a taxi driver. *Id.* at 36–37. But unbeknownst to Jordan and O.H., J.S. had recruited multiple associates to come with him. Three of these men were strangers from New Jersey who had agreed to accompany J.S. in return for the false promise of payment. These three men—L.C., J.R., and K.M.—traveled from New Jersey to accompany J.S. and his

uncle to the exchange.[5] J.S. and his uncle—who did not have the $10,000 payment for Ordaz—evidently also did not have the $10,000 they promised these strangers for their participation.[6]

At the time of the exchange, J.S. and L.C. arrived in one car, with L.C. posing as J.S.'s Uber driver. J.S.'s uncle and his associates waited nearby in a different car. J.S. met Jordan and O.H. in a silver truck for the handoff. Eventually, L.C. joined the men, standing outside the front passenger seat. Ordaz, who was on the phone with O.H., learned that J.S. had brought only $4,000, which led to a dispute over payment. When this dispute arose, L.C. raised his hand to signal J.S.'s associates, who were waiting in the second car nearby:

---

[5] Charlottesville Police Department Field Case Supplement Report dated 1.17.23 (attached as **Exhibit 2**). L.C. reported that he used to work in construction in New York with a man named Jeffrey. L.C. had reached out to Jeffrey for a loan, and Jeffrey had offered him $10,000 to assist J.S. with retrieving his wife. L.C. had then asked his friend J.R. for help, and J.R. had recruited K.M. The three men traveled to this area, where they met J.S., his uncle, and another unidentified family member of J.S.'s.

[6] In fact, when police interviewed J.S.'s uncle after the shooting, they noted that he was "extremely nervous" and "fearful of the other individuals hearing what he might say (i.e. the males from NJ)." *See id.* at USAO_000134.



Within moments, the second car pulled up behind O.H.'s truck, boxing them in.

J.S.'s uncle and the associates from New Jersey immediately piled out of the car for

to confront Jordan and O.H.:



As soon as the truck was boxed in, both J.S. and L.C. lunged across the front seat towards the driver's seat, where O.H. was sitting. Jordan (the young man in a hoodie below) immediately jumped out of the passenger side of the car. Although he was armed, he held his gun pointing towards the ground as he faced the second car:



Jordan backed around the front of the truck in a defensive posture:



Jordan backed all the way around to the driver's side as some of J.S.'s associates approached the truck. Meanwhile, O.H. jumped out of the driver's side of the truck with a rifle. He fired it, then threw the rifle back into the truck. J.S., who had gotten out of the vehicle, dove back inside and grabbed the rifle. J.S. then shot across the truck, firing multiple bullets into both O.H. and Jordan. In the below picture, neither O.H. nor Jordan can be seen. They are both lying behind the truck, bleeding on the ground:



O.H. died. Jordan was shot multiple times in the chest, arm, and head. He suffered extraordinary, life-threatening injuries. Jordan never fired his weapon or even pointed it at anyone, despite the terrifying situation and the opportunity to do so. Although Jordan and O.H. were the only people physically harmed in this offense, Jordan recognizes the trauma and emotional harm he caused to W.G., J.S., their families, and the other persons affected by this offense. Additionally, Jordan recognizes the fear and stress that this event brought to Charlottesville, a town that Ordaz appears to have chosen randomly for this exchange.

## II.    Jordan's Life-Threatening and Life-Changing Injuries

As noted above, Jordan was only eighteen years old—barely an adult—when this offense occurred. Below is a picture of Jordan before his injuries:



Jordan made a mistake by involving himself with Ordaz and agreeing to transport W.G. to Virginia. But he is also the most seriously injured survivor of this shooting, and the only living person who was physically injured. In addition to the loss of O.H., Jordan suffered extensive physical and psychological injuries. His injuries are mitigating in multiple ways. First, they have provided a weighty punishment for the offense. Second, Jordan's injuries have had a strong deterrent effect. Third, in

the Bureau of Prisons, they would make him highly vulnerable, as well as difficult to properly house, protect, and treat.

A.    Jordan Suffered Extreme Injuries and Almost Died.

---

[7] **Exhibit 3** (Compiled Medical Record Excerpts) at JP002443, 2482. Jordan's injuries and treatment have resulted in thousands of pages of medical records, which have been collected and reviewed by the defense and Dr. Merikangas. Exhibit 3 is a compilation of excerpts documenting Jordan's most important procedures, diagnoses, and treatments.
[8] *Id.* at JP001781–84.
[9] *Id.* at JP001781–84, 2484, 2669, 2671.
[10] *Id.* at JP002428.
[11] *Id.* at JP002975. Glasgow scores range from 3 to 15, with anything under 8 indicating a severe brain injury. A score of five is one of the most serious possible coma scores. Brain Injury Association of America, "Glasgow Coma Scale," *available at* https://biausa.org/brain-injury/about-brain-injury/diagnosis/hospital-assessments/glasgow-coma-scale (last accessed May 21, 2025).

[REDACTED]

---

[12] Exhibit 3 at JP002975.

[13] *Id.* at JP002671. The findings are detailed on JP002440.

[14] Johns Hopkins Medicine, "What is a craniotomy?,"
https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/craniotomy (last accessed Dec. 4, 2025).

[15] Exhibit 3 at JP002429, 2436, 2447.

[16] Georgios Solomou, et al., *Decompressive craniectomy in trauma: What you need to know*, 97 J. TRAUMA & ACUTE CARE SURGERY 490 (2024), *available at*
https://journals.lww.com/jtrauma/fulltext/2024/10000/decompressive_craniectomy_in_trauma__what_you_need.2.aspx (last accessed Dec. 4, 2025). The image of a decompressive craniotomy for brain trauma is from Neal Mehan, et al., "Decompressive Craniotomy and Craniectomy for Brain Trauma," 4 CURRENT SURGERY REPORTS (2016).

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████



---

[17] Exhibit 3 at JP002242.





---

[18] *Id.* at JP002439.
[19] *Id.*
[20] *Id.* at JP001655.
[21] *Id.* at JP002463.
[22] *Id.* at JP002452.
[23] *Id.* at JP002518–20.



---

24 *Id.* at JP002509–13.
25 *Id.* at JP001927–29, 2429, 2436, 2439, 2447.
26 *Id.* at JP001934–38.
27 *Id.* at JP001944.



---

[28] *Id.* at JP002487.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ Jordan's family spent many days at his bedside,

bringing him his favorite Spider Man blanket for comfort.



---

[29] *Id.* at JP002565–68.
[30] *Id.* at JP002578–80.
[31] *Id.* at JP002659–63.

████████████████████████████████████████████████

████████████████████████████████████████████████

██████



████████████████████████████████████████████████

██████████████████████████████████████████



---

[32] JP002614.
[33] *Id.* at JP002435–36.
[34] *Id.* at JP002444–45.
[35] *Id.* at JP002500.
[36] *Id.* at JP003141.



---

[37] *Id.* at JP03469–76.
[38] *Id.* at JP003207–20.
[39] *Id.*
[40] *Id.* at JP003082.
[41] *Id.* at JP003070–71.
[42] *Id.* at JP003061–64.
[43] *Id.* at JP002919–20, 2936.



After his discharge from the acute rehabilitation center, Jordan moved in with his mother in Lockhart, Texas. Although he was unable to work, he enjoyed going with his mother to the nursing home where she worked as an assistant. Jordan's mother recalls that he was like a baby after the shooting, going with her to work, following her around the nursing home, and talking to the residents. He also loved to watch his nieces and nephews while their mother, Jordan's sister Savana, worked. Jordan's family recalls that he was childlike in his interactions.

Up until his arrest, Jordan continued to receive medical treatment. ███

---

[44] *Id.* at JP002975–76.

[45] There is extensive research on the relationship between vision and cognition, although most studies focus on the conditions in older adults. *See* Tai Anh Vu, et al., *The Bidirectional Relationship Between Vision and Cognition: A Systematic Review and Meta-analysis,*128 OPHTHALMOLOGY 981 (2021), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0161642020311581 (last visited Dec. 4, 2025) (collecting studies). The relationship between cognition and visual impairment is not fully understood, but "low vision may lead to cognitive impairment" through "several possible pathways, such as increased demands on the brain for processing lower-quality visual input, which would strain already stressed cognitive resources." Kathryn McKenzie, *Why and How to Evaluate Cognitive Problems in Ophthalmology Patients*, EYENET MAGAZINE 25 (2022), *available at* https://www.aao.org/eyenet/article/why-and-how-to-evaluate-cognitive-problems (last accessed Dec. 4, 2025).

[46] *Id.* at JP001664–65.



---

[47] *Id.* at JP002482–84.

[48] *Id.* at JP001655.

[49] *Id.* at JP003913–14.

[50] *Id.* at JP003924–25.

[51] *Id.* at JP003947–48.

[52] *See id.* at JP003891–97, 3878–82.

[53] *See id.*

[54] *Id.* JP003868–72; *see also id.* at JP003788 (noting that Jordan is supposed to receive a prosthetic eye).

B.    Jordan Continues to Suffer and Require Significant Treatment and
      Care.

Jordan was arrested on September 5, 2024. Once he was arrested, Jordan's

access to medical services abruptly declined. ████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ Jordan has spent fifteen months

in federal custody and has not received either surgery. As a result, he does not have

a prosthetic eye. Jordan cannot open his right eye. His eye socket remains empty,

with his eyelid always shut over it.

Behind bars, Jordan's medical conditions have made it difficult for him to

safely navigate jail life. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████

Because Jordan's traumatic brain injury occurred relatively recently, he

continues to face new medical issues that require ongoing evaluation and

treatment. As a result, the consequences of his brain injury are not yet fully

---

[55] JP004709.

[56] *Id.* at JP002386.

[57] *See id.* at JP002387–89.

understood and are likely to develop and change over time. In the correctional

setting, this leaves Jordan at a high risk of injury or death. For example, ██████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[58] *See id.* at JP004946.
[59] *Id.*
[60] *See id.* at JP004943.
[61] *See id.*
[62] *Id.* at JP004941.
[63] *Id.* at JP004943.

---

[64] Exhibit 3 at JP004862.

[65] *Id.*

[66] *Id.*

[67] *Id.* at JP004907.

[68] *Id.*; *see also id.* at JP4869

[69] *Id.* at JP004909.

[70] *Id.* at JP004941.



Jordan's extensive injuries also made him more difficult to evaluate.

---

[71] *Id.* at JP004865 (emphasis added).

[72] *Id.* at JP004932.

[73] *Id.* at JP004937 (emphasis added).

[74] *Id.*

[75] *Id.*

[76] *Id.*

*Id.* at JP002386.

[REDACTED]

[REDACTED]

[REDACTED]

After Jordan's seizure, the defense asked Dr. James Merikangas to evaluate him. Dr. Merikangas is a board-certified neurologist and psychiatrist with "over 45 years of experience treating patients with mental illness and diseases and conditions affecting the brain and nervous system."[79] He is currently a Clinical Professor of Psychiatry and Behavioral Sciences at the George Washington University School of Medicine. Dr. Merikangas reviewed Jordan's extensive medical records and conducted a neurological examination, which includes both physical and mental components. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[77] *Id.* at JP005028–30.

[78] Exhibit 1 at 3 (emphasis added).

[79] Exhibit 1 at 1.

[80] *Id.* at 2.

[81] *Id.*

[82] *Id.*

[83] *Id.*



██████████████████████████████████

███████████████████████████████████

████████████████████████

Notably, Albemarle Charlottesville Regional Jail ("ACRJ") is a well-run, above-average local jail that has quick access to the area's premier emergency medical services. Unlike ACRJ, Bureau of Prisons ("BOP") facilities are often located in rural areas, far from hospitals like UVA. Thus, this account of Jordan's experience is not a critique of ACRJ, but rather a much simpler observation: correctional facilities are not equipped to house, treat, and support people with unusual brain-based conditions such as Jordan Perez's TBI. Simply put, there is no reason to believe that the BOP can or will provide Jordan with better care, even if the BOP asserts that they can manage his conditions.[87]

In addition to the risk of sudden death from seizure, Dr. Merikangas perceives other dangers to Jordan if he is incarcerated. ████████████████████

████████████████████████████████

██████████████████████████████████

---

[87] "While judges may show leniency toward defendants with serious health issues, the BOP rarely, if ever, admits to being incapable of providing care." Walter Pavlo, *Cases Show Medical Care Under Scrutiny at Federal Bureau of Prisons*, FORBES (March 13, 2025), *available at* https://www.forbes.com/sites/walterpavlo/2025/03/13/cases-show-medical-care-under-scrutiny-at-federal-bureau-of-prisons/ (last accessed Dec. 31, 2025); *see, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens (Dec. 2024), *available at* https://oig.justice.gov/sites/default/files/reports/25-009.pdf (last accessed Dec. 31, 2025) (recounting "widespread and troubling operational challenges . . . that substantially affect the health, welfare, and safety of employees and inmates.").
[88] *Id.*



### III.    Other Aspects of Mr. Perez's Personal History and Characteristics

Each of us is influenced not only by our past, but also the situations we

encounter in the present. Although history and present context might seem

separate, in fact they are "highly interrelated, in the sense that our social histories

help to explain the kinds of social situations and circumstances that we are likely to

---

[89] *Id.*

[90] *Id.* Notably, even if Jordan receives a prosthetic eye, he will not be able to see through it. Moreover, as discussed above, Jordan's skull has been reconstructed with numerous plates and screws. This leaves Jordan vulnerable to complex and dangerous injury if ever he is struck in the head, something that Jordan worries about constantly.

[91] *Id.*

[92] *Id.* at 3–4.

[93] *Id.*

[94] *Id.* at 4.

encounter later in life and how we react to them when we do."[95] For many—perhaps most—people, it is difficult to imagine being an eighteen year old transporting an undocumented alien from Texas to Virginia. But Jordan was barely an adult, with a still-developing brain and the judgment of a child. His past led him to a misplaced trust in the Ordaz family, as well as a vulnerability to the appearance of security, or even financial success. As detailed below, Jordan had grown up in poverty, often hungry, and neglected by his parents. Ordaz and his family gave Jordan not only an opportunity for economic security, but also an opportunity to live with an intact family unit, which is Jordan's dream.

Jordan was eighteen years old at the time of the offense. Although eighteen-year-olds are legally adults—albeit barely—it is scientifically well established that the brain is still developing at that age. In fact, "[l]ongitudinal neuroimaging studies demonstrate that the adolescent brain continues to mature well into the 20s."[96] Critically, it is the judgment center of the brain that lags the rest of development. "The frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature" and "may not be fully developed until halfway through the third decade of life."[97]

---

[95] Craig Haney, CRIMINALITY IN CONTEXT 50 (2020),
[96] Sara Johnson, et al., *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. ADOLESC. HEALTH 216 (2009), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/ (last visited Dec. 8, 2025).
[97] *Id.*

The upshot is that many of the reasons the legal system treats adolescents differently—including the fact that they "are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults"[98]—apply equally to eighteen-year-olds. Simply put, it is developmentally normal for eighteen-year-olds to make mistakes that do not reflect their character or predict their future. If they are lucky, teenagers will have protective factors (such as economic and social stability) that reduce the risk that their mistakes will be life changing.[99] If they are less lucky—like Jordan—risk factors such as poverty, neglect, and trauma make them susceptible to mistakes that expose them to the criminal justice system. Ultimately, Jordan's actions at eighteen reflected his youthful impulsiveness and the effects of negative peer influences but tell us little about the adult he can become. Thus, as discussed *supra*, Jordan's age alone is grounds for a variance.

But to understand who Jordan was at eighteen—on the cusp of adulthood—it is critical to understand his childhood, which provides further context and grounds for variance. Jordan is the son of Joseph Oscar Perez, Sr. and Evangelina Hoffman

---

[98] *Graham v. Florida*, 560 U.S. 48, 68 (2010) (quoting *Roper v. Simmons*, 543 U.S. 551, 570 (2005)). *Roper* recognized that "[t]hree general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569. *First*, juveniles are by definition immature and thus may engage in reckless behavior. *Id.* *Second*, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.* *Third*, "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.* at 570. Neuroscience now makes clear that these developmental features of adolescence extend into young adulthood.
[99] *See* Haney, CRIMINALITY IN CONTEXT 56 (noting that children who commit crimes often "have suffered from exposure to a toxic combination of many risk factors and traumas and few, if any, buffers or protective factors.").

(née Hernandez). Jordan's parents were both born in the mid-70's in Corpus Christi, Texas. Because Joseph is an absentee father, less is known about his side of the family. But Joseph's father, Oscar (Jordan's paternal grandfather), died of a heroin overdose when Joseph was only fifteen. Joseph was raised by his mother, Irma Perez, whom Jordan remembers meeting as a child. Unfortunately, Irma also died at a young age (56), leaving Jordan without paternal grandparents.

Jordan's mother, Evangelina, is one of five children of Margarita and Alfredo Hernandez. Margarita traces her long-time Texas lineage back to the family of Padre José Nicolás Ballí, the original grantee of Padre Island.[100] But generations removed from Ballí, Margarita grew up in subsidized housing in Corpus Christi, Texas. There, she met Alfredo, Jordan's maternal grandfather. Alfredo had worked since fifth grade and became the in-house maintenance person for the complex. Margarita and Alfredo married and had five children, including Evangelina. Unfortunately, as a young woman, Evangelina struggled with substance abuse. In her teens, she began dating Joseph Perez, Jordan's father. Joseph was a small-time cocaine dealer who also used drugs. In August 1996, when Joseph was twenty-three years old, he sold crack cocaine to an undercover officer at his home in Corpus Christi.[101] In January 1997, Joseph was charged in connection with the drug sale.[102]

---

[100] Texas State Historical Association, "José Nicolás Ballí: Pioneer Priest and Padre Island Grantee," https://www.tshaonline.org/handbook/entries/balli-jose-nicolas, Sept. 23, 2016 (last accessed Dec. 8, 2025).
[101] **Exhibit 5** (Offense Report).
[102] **Exhibit 6** (Presentment). Joseph ultimately received a deferred disposition on September 29, 1997.

At the time, Evangelina was four months pregnant with their first child, Jacob Perez.

Jacob, Jordan's oldest full sibling, was born on May 21, 1997. (He is six years older than Jordan.) Jacob was Joseph's third child but Evangelina's first. Four months after Jacob's birth, Joseph was indicted federally for distribution of crack cocaine.[103] He was detained pending trial, apparently because he had "twice went AWOL from the Armed Services," and had "delivered crack cocaine twice after being placed on bond for a similar offense."[104] Joseph pleaded guilty and was sentenced to thirty-seven months in the Bureau of Prisons, making him absent for Jacob's early years. Evangelina recalls driving back and forth between Corpus Christi and FCI Bastrop so that Joseph could spend time with his baby.

In 2000, Evangelina and Joseph had their second child, Savana Joy Perez. In 2003, Evangelina became pregnant with Jordan, leading the couple to marry on February 19, 2004.[105] Jordan was born one month later, on March 31, 2004. By December of the same year, however, Evangelina and Joseph had separated.[106] By all accounts, their short marriage was filled with conflict. The primary conflict stemmed from the accusation that Evangelina had cheated on Joseph, and that Jordan was not Joseph's biological child. This accusation led Joseph—already a distant and neglectful father to his other children—to reject Jordan outright. In September 2005, the divorce was finalized. Evangelina was named the children's

---

[103] **Exhibit 7** (Indictment).
[104] **Exhibit 8** (Detention Order).
[105] **Exhibit 9** (Divorce Petition) at 2.
[106] *Id.*

primary caretaker and Joseph was ordered to pay $425 per month in child support. Joseph consistently neglected this obligation, racking up a substantial arrearage that left Evangelina and their three children (including Jordan) in poverty.[107]

During this time, Evangelina began seeing another man, Rudy Rubio, the financially stable owner of a local mechanic shop. (It is not clear exactly when the two began dating, as Joseph alleged infidelity.) What is clear, however, is that Rudy was a dangerous, terrifying presence in the Perez family. At the time that Evangelina and Rudy began dating, Rudy was being prosecuted for four counts of indecent liberties with a child.[108] For four years, Rudy had been molesting his niece, aged seven to eleven during the crimes. Rubio confessed the offense to his nephew and offered to give the family $20,000 to keep it quiet.[109] A criminal investigation uncovered an allegation that Rubio had also molested his niece's friend. When the mother of the victim told Rubio's then-wife what had occurred, she "reported that Rudy had also done this to a 10 year old girl before they got together."[110] Rubio pleaded guilty, received a deferred disposition with five years of supervision, and became a registered sex offender.[111]

Jordan and his siblings have vivid memories of their years with Rubio. Both Rubio and Evangelina drank and used drugs, often going out and leaving the children with no supervision and nothing to eat. Jordan's father was angry at

---

[107] *See* **Exhibit 10** (Support Order).
[108] **Exhibit 11** (Rubio Presentment)
[109] **Exhibit 12** (Affidavit Complaint).
[110] **Exhibit 13** (Social Work Consult).
[111] **Exhibit 14** (Plea and Judgment).

Evangelina for dating a sex offender but did not take action to remove or support his children. Soon, Evangelina and Rubio had a child together, Jordan's half-brother Rudy Rubio, Jr. But Rubio was extremely physically abusive to Evangelina, beating her in front of the children. Rubio's abuse culminated in a horrific assault on January 28, 2011, when Jordan was eight years old.[112] The day before the assault, Evangelina and Rubio had been drinking at a nightclub, which they left in the early morning hours. Rubio drove Evangelina to the Memory Gardens Cemetery, where his father and sister were buried. Once there, Rubio dragged Evangelina by her hair, looking for his father's grave so that Evangelina could "tell his father how bad of a person she was."[113] She woke up the next morning in the apartment above Rubio's shop, where Margarita had come looking for her. Evangelina was naked and badly injured.[114]

When interviewed, Margarita told police that she had been babysitting Rudy Rubio, Jr. when Evangelina and Rubio went out partying. (It is unclear where Jordan and his full siblings were living at the time. The siblings recall being bounced between homes, and records show significant residential instability.) Margarita had warned Evangelina "not to drink so much because I know what kind of person Rudy is when he gets drunk. It had happened before where [Evangelina] tells me that she does not remember what happened the next day after she goes out with Rudy and they drink."[115] When Evangelina did not come home that night,

---

[112] **Exhibit 15** (Affidavit and Incident Report).
[113] *Id.*
[114] *Id.*
[115] **Exhibit 16** (Margarita Hernandez Statement).

44

Margarita found her at Rudy's shop. According to Margarita, "I looked at her face and it was swollen really bad. Her hair was matted and I later found out it was because she had a gash on her head and two more on the back of her head."[116]

Margarita took Evangelina to a doctor, who sent them to the emergency room.[117] According to the responding officer, Evangelina "was unable to sit up and [was] also very weak and unable to write her victim's statement."[118] When Evangelina gave a statement a few days later, she noted that she had been with Rubio "for the past 6 years" and that they had lived together for approximately one year in the past.[119] Evangelina admitted, "Rudy has assaulted me in the past but I never have reported the assaults to the police. On 9/28/10 I was assaulted by Rudy and he also took my phone . . . . Even though I didn't want to file charges on him the police department filed them anyway."[120] Like many victims of intimate partner violence, Evangelina seems to have been traumatized and plagued with indecision and self-doubt. "I'm not sure if I want to file charges on Rudy," she wrote. "I do know that he needs help with whatever it is that makes him get to upset that he takes it out on me."[121]

After this assault, Evangelina's parents helped her relocate to Lockhart, afraid "that Rudy would hurt her again" if she stayed in Corpus Christi.[122] While

---

[116] *Id.*
[117] Exhibit 15.
[118] *Id.*
[119] **Exhibit 17** (Evangelina Hernandez Statement).
[120] *Id.*
[121] *Id.*
[122] Exhibit 16.

moving, they "found that Rudy had left at least 7 dozen roses and assorted flowers with boxes of candies at the door to her apartment."[123] Rudy continued to frighten the family through frequent texts and calls, claiming he was coming over to see his son despite being told not to. The family feared that Rudy, who "always carrie[d] a gun in his vehicle," was armed.[124] Margarita also observed that Rubio "seems to know every move [Evangelina] makes . . . .I don't like the feeling that he seems to be stalking her."[125] Because Rubio had previously assaulted Evangelina, he was charged with a felony (continuous violence against the family).[126] He pleaded no contest and received a deferred disposition.[127]

Much to the family's dismay, Evangelina reunited with Rubio. Over their years together, Jordan and his siblings moved from home to home with Evangelina, often staying in a different low-income apartment, decrepit duplex, or trailer park. Jordan remembers bouncing between Lockhart and Corpus Christi, feeling scared and angry that there was nothing he could do to help his mom. Evangelina was often out with Rubio or working nights and sleeping during the day, leaving the children to fend for themselves. In a mitigation video submitted as **Exhibit 23**, Jordan's older siblings, Jacob and Savana, recount the children's struggles to raise themselves. They were often without meals, scrounging the kitchen for cereal, canned soup, or something else to prepare. Although Savana was only four years

---

[123] *Id.*
[124] **Exhibit 18** (Emails from Margarita Hernandez to Detective).
[125] *Id.*
[126] **Exhibit 19** (Presentment).
[127] **Exhibit 20** (Order of Deferred Adjudication).

older, Jordan recalls that she was like a mother to him, making sure that he was fed and taken care of as best she could. Because Jacob and Savana were children themselves, however, they could not parent Jordan the way that he needed.

In 2013, when Jordan was nine years old, he was briefly sent to Corpus Christi to live under his father's guardianship. Shortly thereafter, Rubio was charged with numerous counts in connection with the kidnapping and aggravated sexual assault of an unrelated young woman. *Rubio v. State*, 534 S.W.3d 20 (Tex. Ct. App. 2017). This sexual assault happened at the same shop where Evangelina had been found after Rubio's vicious assault on her. A notice of extraneous offenses filed in conjunction with the ensuing criminal proceedings noted that Rubio had a serious criminal history. In addition to his prior child molestations, Rubio had forcibly masturbated in front of another woman in 2012 and had a positive cocaine test in 2013.[128] Disturbingly, during a 2013 field visit to his home, Rubio "admitted to making a video at his home with a number of electronic devices aimed at a bed. There were children's videos around his home and two children's bedrooms located in his home."[129] Ultimately, Rubio was convicted of one count of aggravated assault and received a life sentence. *Rubio*, 534 S.W.3d at 21.

In 2014, Evangelina took Jordan back, moving him from Corpus Christi to Wharton, Texas, where he continued fourth grade. Evangelina married a man named Steve Hoffman, and the Perez family briefly lived with him in Wharton. Evangelina really liked Steve, whom Jordan viewed as a stepfather. Unfortunately,

---

[128] **Exhibit 21** (Notice of Extraneous Offenses).
[129] *Id.*

Steve eventually left her for another woman. Around the same time, Jordan's older brother Jacob—then only seventeen years old himself—learned that he was expecting a child and was told to move out. Jacob had always been a loving and supportive older brother, so his transition out of the home left Jordan without an important in-home advocate and protector.

Over the next few years, Jordan moved frequently as his mother shifted between relationships and homes. When Jordan was in sixth grade, Evangelina started dating a man named Travis, and the couple moved into a cramped trailer or RV outside Lockhart. Although she was only a teenager, Savana went to live with an abusive boyfriend who made sure there was a consistent address and food on the table—a choice that she now realizes reflects the trauma of their childhood. Meanwhile, by seventh grade, Jordan was living mostly with his friend Gabriel, who stayed in an apartment in Lockhart with his mother. There was no real discussion about Jordan living at Gabriel's: the move simply happened, with no apparent resistance from Jordan's parents. By the time Jordan was in eighth grade, his mom had moved on to a man named Simon, a heavy drinker whom the children disliked. After months at Gabriel's apartment, Jordan moved in with an adult man named Lalo, who was in his thirties. At the time, Jordan played little league baseball and Lalo came to a lot of his games and practices. Young Jordan thought of Lalo as a father figure but does not have an ongoing relationship with the older man.

Jordan easily slipped between the cracks. As seen on the accompanying mitigation video, counselors at Lockhart Public Schools liked Jordan, whom they

describe as a "good kid." Jordan was polite, and multiple school employees spontaneously observed that they would trust Jordan with their daughter—high praise from any mother about a teenage boy. But they also worried greatly about Jordan, who would come to school hungry and in dirty clothes, and who seemed not to have close friends. Sometimes, school employees went to Evangelina's apartment to check for Jordan and would find him unattended there. The overwhelming impression—which was true—was that Jordan had no adult oversight.

As a freshman in high school, Jordan began playing football at Lockhart High School. Although he had little parental support, Jordan was athletic, strong, and fast. In Texas, high school football is legendarily competitive and high profile, giving Jordan a goal: playing college football. Jordan also participated in Gear Up, a program focused on college preparation. One of the Gear Up representatives told Jordan that if he got good grades and kept up his football performance, he would have a shot at Texas A&M. At the same time, Jordan began to smoke marijuana and found himself quickly overusing (perhaps an unsurprisingly result, given his parental history of substance abuse). After Jordan received a juvenile possession charge in 2019, he was removed from the team. Jordan remembers crying in the team office and feeling like his life was over.

After his juvenile arrest, Jordan was sent to alternative school. Soon, the COVID-19 pandemic shut down schools, and Jordan slipped further through the cracks. In 2022, Jordan met Ricardo Ordaz and began spending time with him. Teenage Jordan was impressed by the older man's money and the life he lived on a

large property, together with his parents and sister. Jordan soon fell for Ordaz's

sister, B.O., and they began dating. The Ordaz family allowed Jordan to stay at

their property, where he often lived in a small camper. The Ordaz family gave

Jordan construction jobs and introduced him to alien smuggling. Ordaz also

introduced Jordan to harder drugs, leading Jordan to try cocaine and

methamphetamine.

On April 1, 2022, the day after Jordan's eighteenth birthday, he was injured

in a serious car accident. At the time, Jordan was driving a pickup truck, which was

suddenly struck by a coach bus that was illegally exiting a driveway. Jordan

suffered a fractured tibia and fibula. B.O., who was with Jordan in the car, was also

injured. The Ordaz family supported Jordan physically, emotionally, and financially

during his recovery. Jordan felt increasingly welcomed by and bonded to them. Less

than one year later, Ricardo Ordaz recruited Jordan to make the drive that ended in

this tragedy.

## IV.  **Other § 3553 Sentencing Factors**

### A.  Need for Treatment and Training in the Most Effective Manner

Jordan Perez is a different person from the one he was before this offense.

Physically, Jordan has suffered irreparable injuries that will put him at risk of

sudden death and will forever limit how he can interact with the world around him.

Mentally, Jordan is traumatized and living with the effects of a traumatic brain

injury. Emotionally, Jordan has learned a life's worth of lessons in one of the

hardest ways possible. As Dr. Merikangas opines, Jordan is not able to live

independently and cannot be housed safely in prison. The obvious question is where

Jordan would go if he were released. Thankfully, he now has something he lacked before: strong, stable adults in his life.

As a child, Jordan and his siblings were neglected by their father and experienced extreme instability living with their mother. Jacob and Savana, Jordan's older siblings, always tended to and protected him the best that they could but were children themselves. In the past, their own youth limited their ability to help and support Jordan. But now, Jacob is twenty-eight and a supervisor for a glass company in Dallas, Texas. Insightful, humble, and stable, Jacob has become an important positive adult figure in Jordan's life. The brothers talk every day, often multiple times a day. Jacob is also Jordan's power of attorney, a decision Jordan made that reflects his trust in and respect for his older brother. Jacob would welcome Jordan to live with him in Dallas, Texas and is happy to provide his brother with the support he needs. Meanwhile, Savana is twenty-five, and the mother of five young children of her own, two of whom are nonverbal. Savana's children are very attached to their uncle Jordan, and Savana would also provide Jordan with emotional support.[130]

In the accompanying mitigation video, both Jacob and Savana share their family story. What is clear from Jordan's siblings is that they both have achieved the insight and wisdom to understand their upbringing, reflect on it, and explain how it impacted each of them. When they were teenagers, both left the family home, forced by circumstances to become independent and navigate life's challenges. Both

---

[130] *See* **Exhibit 22** (Drawings made by Jordan for his nieces).

have succeeded in establishing healthy lives. At the same time, both love their
relatives, including their mother, and respect the importance of family. This gives
them the experience to help Jordan establish a positive future that is connected to
his family but has healthy boundaries.

As discussed above, when Jordan first returned to Texas, he stayed at a
rehabilitation center where his treatment team noted that he lived with his mother
in economically unstable circumstances. When initially discharged from the
rehabilitation center, Jordan (then 19 years old) had suffered a life-changing
trauma and lacked the support and planning necessary for immediate success.
Although Jordan received medical treatment, he did not receive the substance
abuse or mental health services appropriate to treat a young man with PTSD and
new disabilities to navigate. Consequently, Jordan struggled to adjust to life with
his injuries and did not experience a full emotional recovery. With the passage of
time and a better understanding of Jordan's needs, however, both Jacob and his
siblings are committed to ensuring a positive re-entry in which all of his treatment
needs are addressed. Thus, if the Court were to sentence Jordan to time served, he
would not return to live with his mother or to the Lockhart, Texas area. Instead,
Jordan would move to Dallas, Texas, where he could live with Jacob.

During the pendency of this case, Jacob has been assisting Jordan and the
defense team in identifying appropriate services in the Dallas area. Jacob resides in
South Dallas, close to both the Baylor Scott-White Medical Center and University of
Texas Southwestern medical services. Both centers provide high-quality medical

care and would be accessible for Jordan's ongoing medical needs. Both also provide mental health counseling services and substance abuse services. In addition to the local hospitals, Jordan's support system has identified multiple programs that would help him obtain services for post-traumatic stress disorder and substance abuse. Unity Behavioral Health, a local treatment program, offers intensive outpatient services to patients with Medicaid, which Jordan will have upon return to Texas.[131] Metrocare, "[t]he largest provider of mental health and developmental disability services in Dallas county," provides both mental health and substance abuse services with financial assistance.[132] Additionally, Recovery Resource Council in Fort Worth provides a range of substance abuse services, including trauma-informed inpatient and outpatient treatment, with financial assistance.[133]

Because of Jordan's traumatic brain injury and cognitive deficits, vocational training is the most practical educational course. Living with Jacob in Dallas would allow Jordan to access multiple opportunities. For example, the 24 Hour Club is a local Dallas facility that is based on twelve-step principles but extends far beyond meetings, providing free vocational training and life skills courses.[134] In addition to signing up for free classes through this organization, Jordan could attend classes at Grahams Barber College, which is accepting new students. Before his injury,

---

[131] *See* United Behavioral, Services, https://unitybehavioral.com/services (last visited Dec. 31, 2025).
[132] Metrocare, Charity Care, https://www.metrocareservices.org/charitycare/ (last visited Dec. 31, 2025).
[133] Recovery Resource Council, https://recoverycouncil.org/recovery-services/ (last visited Dec. 31, 2025).
[134] 24 Hour Club, https://www.dallas24hourclub.org/ (last visited Dec. 31, 2025).

Jordan cut hair for his little brother and his friends, and he is passionate about learning this trade. Thus, living with Jacob in Dallas would provide Jordan with a healthy, stable environment in which he could receive effective treatments and vocational opportunities.

B.    Deterrence, Punishment, and Respect for the Law

Jordan recognizes that this Court must also consider the need for punishment, deterrence, and promotion of respect for the law. In most cases, the offense does not provide a direct punishment, but in this case it did. As a result of his conduct, Jordan has suffered life-changing, permanent injuries that have changed the course of his young life. The circumstances of this case amply demonstrate the risks of alien smuggling, and the impact of the offense on Jordan alone has a strong deterrent effect. In other words, Jordan has already been punished beyond what prison can provide. Moreover, under the unique circumstances of this case, a time-served sentence promotes respect for the law, as it is abundantly clear that participation in such a crime risks not only imprisonment, but also death or disability.

Jordan also recognizes that he when he was first released from the rehabilitation center, he did not immediately succeed. This does not reflect a lack of seriousness on Jordan's part, but rather the scars of untreated, acute trauma. PTSD is a condition that affects the whole person, altering their mental, emotional, and physical interactions with the world. "Being traumatized means continuing to organize your life as if the trauma were still going on—unchanged and immutable—

as every new encounter or event is contaminated by the past."[135] "Trauma affects the entire human organism—body, mind, and brain. In PTSD the body continues to defend against a threat that belongs to the past. Healing from PTSD means being able to terminate this continued stress mobilization and restore the entire organism to safety."[136]

After the death of O.H., the traumatic shooting, and his near-death, Jordan felt unsafe in his environment, and unable to protect himself. He experienced the anxiety, stress, fear, and flashbacks common with the activation of PTSD. In the sudden aftermath of life-changing injury and stress, Jordan self-medicated these feelings with marijuana. Since his incarceration, Jordan has continued to mature and is now almost twenty-two years old. He understands that firearms cannot keep him safe and that marijuana cannot treat the effects of trauma. Jordan is thus committed to engaging with necessary services when he reenters society and building a healthy life. Thankfully for Jordan, PTSD is a highly treatable mental health condition,[137] and there are numerous services available in Dallas.

C.     The Need to Avoid Sentencing Disparities

Jordan's position in this case is indubitably unique. The defense agrees with the government that his sentence should be substantially below whatever sentence

---

[135] Bessel van der Kolk, THE BODY KEEPS THE SCORE: BRAIN, MIND, AND BODY IN THE HEALING OF TRAUMA 53 (2014).

[136] *Id.*

[137] *See, e.g.*, American Psychiatric Association, "What is Posttraumatic Stress Disorder (PTSD)?," https://www.psychiatry.org/patients-families/ptsd/what-is-ptsd (March 2025) (last accessed Dec. 31, 2025) (noting that both medication and various forms of therapy can effectively treat PTSD).

his codefendant, Ordaz, receives. The defense also agrees that a significant difference in their sentences "is supported by the facts of the case, their respective roles in the TCO, and Perez's personal mitigating circumstances." Doc. 98 at 12. The defense further agrees that "Ordaz, as the organizer and leader of this TCO, bears the greatest responsibility for the tragic and violent events that unfolded in Charlottesville and claimed the life of O.H." Doc. 99 at 10; *see also* Doc. 98 at 10 (noting that Jordan "had a more limited role in the TCO and himself suffered serious harm").[138] Sentencing Jordan to sixteen months thus would not result in any unwarranted disparity with Ordaz.

## **CONCLUSION**

In sum, Jordan Perez was only eighteen years old when he agreed to transport an alien from Texas to Virginia. His involvement in this offense reflects the famously poor judgment of youth, and his vulnerability to the promise of economic security and a sense of belonging. It does not reflect who Jordan is as a person, nor the person he is becoming as an adult.

The case before the Court is an extraordinary one. Jordan's friend is dead, and Jordan narrowly survived. He will live the rest of his life both physically and mentally disabled because of choices he made when he was a teenager. *See* PSR at ¶ 83 ("As a result of his brain injury, the defendant will be permanently disabled and unable to live independently.") The uniquely punishing circumstances of this

---

[138] Moreover, a sentence is "not 'unreasonable under § 3553(a)(6) merely because it creates a disparity with a co-defendant's sentence.'" *United States v. Gillespie*, 27 F.4th 934, 945 (4th Cir. 2022) (quoting *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007)).

offense render further incarceration not only unnecessary, but also unproductive and harmful. For this young man, in this once-in-a-lifetime case, the only appropriate result is to be returned to his brother for assistance and support. Jordan's extensive and life-changing injuries guarantee that his punishment will be permanent.

Respectfully submitted,
Jordan Perez

s/ Bernadette Donovan
Bernadette M. Donovan
VA BAR 82054
Donovan & Engle, PLLC
1134 East High Street, Unit A
Charlottesville, VA 22902
Ph. 800-428-5214
Fax 434-465-6866
bernadette@donovanengle.com

Donald R. Pender, Esq.
V.A. Bar No.: 97455
N.C. Bar No.: 48004
Assistant Federal Public Defender
Office of the Federal Public Defender
401 E. Market Street, Suite 106
Charlottesville, VA 22902
Ph. (434) 220-3392
Fax (434) 220-3390
Don_Pender@fd.org

*Counsel for Jordan Perez*

**CERTIFICATE OF SERVICE**

    I, Bernadette Donovan, Esq., hereby certify that on this January 2, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

                                           */s/ Bernadette M. Donovan*
                                           Bernadette M. Donovan